## V. G. Nahrgang v. United States

**No. 7214.**—Invoice dated Potenza, Italy, June 8, 1940.
Certified June 8, 1940.
Entered at Detroit, Mich., July 9, 1940.
Entry No. 178.

(Decided April 24, 1947)

*Tompkins & Tompkins* (*J. Stuart Tompkins* and *Walter Auster* of counsel) for the plaintiff.

*Paul P. Rao*, Assistant Attorney General (*Howard L. Harawitz*, special attorney), for the defendant.

MOLLISON, Judge: This is an appeal for reappraisement from findings of value made by the appraiser at the port of Detroit on 12 piano accordions exported from Italy on June 12, 1940. Eight of the accordions had 41 treble keys, 120 bass, four sets of reeds, and one shift, while the other four accordions were identical in description save that they had three shifts instead of one. The one-shift accordions were invoiced at $47 each and the three-shift accordions at $55 each, plus packing, and were entered at those prices plus 20 per centum, plus packing. They were appraised at $54 and $63 each, respectively, per accordion, plus 20 per centum, plus packing.

The plaintiff contends that the merchandise should be appraised on the basis of cost of production, as defined in section 402 (f) of the Tariff Act of 1930 (19 U. S. C., 1940 ed., § 1402 (f)),[1] which, it is claimed, is represented by the invoiced values. The defendant, on the other hand, contends that the accordions are properly dutiable on the basis of export value, as defined in section 402 (d) of the same act (19

---

[1] (f) COST OF PRODUCTION.—For the purpose of this title, the cost of production of imported merchandise shall be the sum of—

(1) The cost of materials of, and of fabrication, manipulation, or other process employed in manufacturing or producing such or similar merchandise, at a time preceding the date of exportation of the particular merchandise under consideration which would ordinarily permit the manufacture or production of the particular merchandise under consideration in the usual course of business;

(2) The usual general expenses (not less than 10 per centum of such cost) in the case of such or similar merchandise;

(3) The cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the particular merchandise under consideration in condition, packed ready for shipment to the United States; and

(4) An addition for profit (not less than 8 per centum of the sum of the amounts found under paragraphs (1) and (2) of this subdivision) equal to the profit which ordinarily is added, in the case of merchandise of the same general character as the particular merchandise under consideration, by manufacturers or producers in the country of manufacture or production who are engaged in the production or manufacture of merchandise of the same class or kind.

U. S. C., 1940 ed., § 1402 (d)),[2] and that such values are represented by the appraised values.

In support of its claim for values based upon the cost-of-production formula, the plaintiff offered evidence to establish that the accordions in issue were not regular stock type accordions but were made upon special order of the importer, Vincent Castiglione. Mr. Castiglione testified that in September 1939, he ordered certain accordions from the firm of Pigini & Carbonari (apparently of Potenza, Italy), but that before the order was executed the firm went into bankruptcy. The order was then transferred to the exporter of the present merchandise, La Fisarmonica, of Potenza, Italy, and the accordions in issue were supplied in response to the said order. Mr. Castiglione stated that he supplied a photograph of the kind of accordions he wanted to Pigini & Carbonari, but that the instruments received from the exporter were "not the way I ordered it," and that he was disappointed "because of the cheap construction all the way around."

It does not appear to be disputed that at least two types of accordions are recognized in the trade that deals in such instruments, i. e., "commercial" and "professional." From the evidence it seems clear that the term "commercial" is reserved for an instrument produced on a mass-production basis, using machine-made parts and particularly machine-made reeds, while the term "professional" is reserved for such instruments made by hand of superior materials. The difference between the two types is represented by better tone quality and longer life in the latter.

The term "streamline" appears to be used to denote an accordion having rounded instead of square corners, but it likewise appears that an accordion may be either "commercial" or "professional" and also be "streamline." The evidence indicates that the accordions here in issue are the "commercial" type of instruments, and that they are "streamline."

It seems also clear that there are various qualities of both the "commercial" and the "professional" type of instrument. Four witnesses for the plaintiff, all demonstrating experience in the accordion field, established by their testimony that the instant accordions were of the poorest quality of the "commercial" type, pointing out that the reeds, upon which the tone quality depends, were machine made and of poor quality, that the wood of which the keys were made

---

[2] (d) EXPORT VALUE.—The export value of imported merchandise shall be the market value or the price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

was unseasoned and consequently warped so that two keys moved when one was depressed, and that only one aluminum plate on which the treble shift rods slide was used, whereas in the better grade of the commercial type two plates are used, and, in general, that the workmanship was of poor quality.

On behalf of the plaintiff there was offered in evidence a document purporting to be the affidavit of Egisto Bontempi, who therein describes himself as the owner and manager of La Fisarmonica, makers of piano accordions, located at Potenza, Italy. During the course of the statements made in the said document, Mr. Bontempi refers to certain other documents, namely, so-called exhibits B and C, said to be the specifications and photograph originally sent by Mr. Castiglione with his order to Pigini & Carbonari, and so-called exhibits D, E, and F, said to be correspondence between Mr. Castiglione and Mr. Bontempi in connection with the latter's agreement to execute the order. Although these exhibits are said in the affidavit to be attached thereto, they are not found with the document as offered, and Mr. Castiglione testified that they were not with the document as received by him from Italy.

Vigorous objection to the admission of the document as an affidavit is made by counsel for the defendant on the ground that such incompleteness renders the document incompetent as evidence, and *W. X. Huber Co. et al.* v. *United States,* 9 Cust. Ct. 663, Reap. Dec. 5744, and Wigmore on Evidence, Third Edition, vol. VII, sec. 2104, are cited in support of the objection. In the *Huber* case, the question arose upon objection on the part of plaintiff to the admission of certain certified copies of reports of special agents on the ground that they were not accompanied by the samples referred to therein. One of the vital questions in that case was whether the merchandise (which consisted of tiles) sold in the home market was the same as or similar to that sold for export to the United States. The samples referred to in the reports purported to represent tiles covered by home market sales and tiles covered by export sales.

The judge of this court, before whom the reappraisement proceedings in the *Huber* case were tried, ruled that the so-called certified copies of the reports were inadmissible "inasmuch as a certified copy of an incomplete report is a contradiction in terms" and on the ground that the samples were a material part of the reports.

As I view the situation with respect to the affidavit before me, similar conditions do not obtain. Of course, mere incompleteness in and of itself, does not render exhibit 2 inadmissible. 32 C. J. S. § 774, Note 20; *Kelly* v. *Crawford,* 72 U. S. 785, 18 L. Ed. 563; and *Barber* v. *International Co.,* 73 Conn. 587, 48 Atl. 758. Neither the photograph of the accordions ordered, nor the specifications thereof, nor the

correspondence in reference thereto are essential to an adequate understanding of the affidavit itself, nor are they vital and material to a determination of the issue. A pertinent case is *Barber* v. *International Co.*, *supra.*. That case involved a suit to enforce the rights of certain parties to a contract which was executed and located abroad. A compared copy of the contract was offered in evidence, and it appeared that certain schedules referred to therein and stipulated to be a part thereof were not included in the copy offered. In ruling that the compared copy of the contract was not rendered inadmissible in evidence by the omission of the schedules attached to the original, the court said:

> * * * Nor did the omission, in the copy, of the schedules attached to the ·original document, notwithstanding it declared that "the schedules set out hereunder shall be deemed part of this agreement" [render the copy inadmissible]. They constituted, nevertheless, a separate and distinct paper. The contract, so far as appeared upon its face, was complete and effectual without reference to them. The trial court was justified in presuming that they contained mere details of what it had stated in general terms, no claim having been made that they varied the meaning of the contract to which they were attached.

It is the fact that such a photograph, specifications, and correspondence were in existence—not the contents thereof—that is material to the case, and their existence is apparent from the words of the affidavit itself, which corroborates the testimony of Mr. Castiglione. In the rule as enunciated by Wigmore in the volume and section cited above, the following is said:

> Where a writing offered *refers to another writing,* the latter should also be put in at the same time, *provided the reference is such as to make it probable that the latter is requisite to a full understanding of the effect of the former.* [Last italics mine.]

A full understanding of the affidavit may be obtained from an examination of the affidavit itself, and the legal effect of the affidavit may be determined without knowledge of the details of the unattached exhibits. See in this connection Wigmore on Evidence, third edition, vol. VII, sec. 2104, 32 C. J. S. § 774, Note 20, and *Barber* v. *International Co.*, *supra.*

Here we are not concerned with what the photograph, specifications, and correspondence called for, as we are with the fact that the accordions were ordered upon specifications and not from stock types. The statements in the affidavit establish these facts, and go on to say:

> Said 13 accordions [12 of which are here involved] were not similar to any of the regular accordions listed in our price list of November 1939. These 13 accordions are about the cheapest grade ever built by La Fisarmonica.

I therefore adhere to the ruling made on circuit admitting the affidavit into evidence as exhibit 2, overruling the objections made by counsel for the defendant with respect thereto under leave from the court.

Counsel for the defendant offered in evidence a certified copy of a report dated Milan, Italy, March 9, 1939, signed by Bernard Wait, Supervising Treasury Attaché, relating to an investigation made at La Fisarmonica on February 10, 1939, by Customs Clerk Nicholas Paterniti. Objection to its admission was made by counsel for the plaintiff "upon the general grounds it is incompetent, irrelevant, immaterial, and hearsay, and not the best evidence." Examination of the report reveals that it relates to a shipment of accordions made on November 25, 1938, to an importer other than the plaintiff, and, so far as can be gleaned from the information contained therein, refers to merchandise of a type different from that here involved. A price list, in the French language, but without translation, is attached thereto. Since the report appears to refer to a different type of merchandise and to conditions considerably antedating the exportation of the merchandise in question, June 1940, it would seem that the general objections of immateriality and irrelevancy would reach the document and bar its admission. I accordingly reverse the ruling made on circuit and exclude the report from evidence, and the document heretofore marked exhibit 7 will therefore be marked exhibit 7 for identification, an exception to this ruling being allowed the defendant.

A certified copy of another report dated September 6, 1940, signed by Joseph A. Fortier, Treasury representative, was received in evidence as exhibit 6. This purports to detail an investigation made at Mr. Castiglione's offices with reference, among other things, to the 12 accordions in question. Certain exhibits said to be marked "A," "B," and "C" are referred to in the report as attached thereto, but are not with the document as the court finds it. These, however, do not appear to be material. A letter in the Italian language, of which a translation was supplied, and a price list, marked "Exhibit D," referred to in the report, are found and constitute defendant's exhibits 3 and 5, respectively. The letter, dated February 11, 1940, and addressed by La Fisarmonica to Mr. Castiglione, does not seem to refer to the accordions in question, but to a projected order for 50 accordions. As to these, it is said:

* * * We can make them in regular models for the prices quoted in the enclosed price list or of any other form or model you wish if you send us the photos and give us the instructions that your experience suggests.

thus demonstrating that the course of business claimed by the plaintiff to have been followed in this case was not an unusual practice.

The price list, dated November 1939, is obviously the basis for the appraised values, but it is noted that Mr. Bontempi's affidavit, exhibit 2, states:

Said 13 accordions were very different in materials, design and structure from any of the accordions which my firm ordinarily and regularly manufactured,

which are referred to in my firm's price list of November 1939, which price list is hereto attached and made a part of this affidavit, and marked Exhibit A, nor were said 13 accordions commercially interchangeable with any of the accordions covered by said price list.

Another letter, marked "Exhibit E," in the Italian language, dated at Potenza Picena, May 20, 1940, addressed by La Fisarmonica to the importer herein, is referred to in said exhibit 6, and, together with a translation thereof, is found in the record as collective exhibit 4. In the first paragraph thereof, obviously referring to the shipment here in question, it is said:

The coming week we will ship the 13 accordions that you ordered from us in your telegram of the 23rd of March and herewith you will find the bill.

The remainder of the letter apparently relates to other merchandise except that it is observed that—

* * * from the 18th of May there went into effect a new price list 20 per cent superior than what we practiced until now.

On this point, however, the following appears in Mr. Bontempi's affidavit, exhibit 2:

In Italy during all of the years 1939 and 1940, the prices of accordions of each of the three types "commercial", "non-commercial" and "streamlined", manufactured in Italy by my Italian competitors including Bontempi Ubaldo & Figli; Pigini & Carbonari, and Flli. Ballom Burini, as well as my own prices, both for home consumption and for export, were officially regulated and controlled by the Italian Association of Accordion and Parts Mfrs., "Confisa". On May 16, 1940 said Association by a resolution of its Board of Directors, increased the prices of accordions to be exported by 20 per cent, specifically providing, however, that the raised prices would not go into effect or be practiced until August 1, 1940.

I am satisfied from a consideration of all the evidence that the accordions in question were neither such as nor similar to any piano accordions which at the time of exportation thereof were being freely offered for sale, either for home consumption or for exportation to this country, and I accordingly find that neither foreign nor export value, as defined in sections 402 (c), as amended, and (d) of the Tariff Act of 1930 existed for the merchandise in issue.

I am likewise satisfied that the evidence establishes that at the time of exportation of the merchandise at bar no such or similar imported merchandise was freely offered for sale for domestic consumption in the principal market of the United States, and hence there was no United States value for the merchandise in question.

It follows, therefore, that cost of production, as defined in section 402 (f) of the act is the proper basis for the valuation of the merchandise at bar, and I so find. The cost-of-production formula, quoted above in the margin, is divided into four items, the total of which

represents the statutory cost of production. The affidavit, exhibit 2, contains statements of manufacturing costs during the period from October 1939 to June 1940, for the two different types of accordions here involved. With respect to the one-shift instruments the affidavit shows the elements involved in item (1) of the statutory formula, cost of materials, manipulation, and labor, to have been $32.25, general expenses, including light, heat, depreciation, insurance, rental, taxes, sales expenses, and miscellaneous, to have been $6.75, the cost of containers $1.50, and profit $6.50, or a total of $47 per instrument. A similar break-down of the figures given for the statutory items for the three-shift instruments shows a cost of production of $55.

I find these values to represent the statutory cost of production of the involved merchandise, and judgment will issue accordingly.